UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

LAWRENCE T. BROWN,

     Plaintiff,

v.                              Case No. 3:17cv691-TKW-HTC

JOE MASTRO,
DAVIS,
DAVID DELANEY,
LAWRENCE NELSON,
PUCKETT,
RIGSBY, and
LILLY.

     Defendants.

_____/

## REPORT AND RECOMMENDATION

     This matter is before the Court on Defendants' motions for summary judgment. ECF Docs. 80, 82.[1] The matter was referred to the undersigned Magistrate Judge for preliminary screening and report and recommendation pursuant to 28 U.S.C. § 636 and N.D. Fla. Loc. R. 72.2(B). Upon review and careful consideration of the parties' submissions, including Plaintiff's response (ECF Doc.

---

[1] Defendants Mastro, Delaney, Rigsby, Davis, Puckett, and Nelson filed a motion for summary judgment (ECF Doc. 80), and Defendant Lilly filed a separate motion for summary judgment (ECF Doc. 82).

85), the undersigned recommends the motions be GRANTED and judgment entered in favor of Defendants on all claims.

## I.   BACKGROUND

Plaintiff Brown, an inmate of the Indiana Department of Corrections, proceeding *pro se* and *in forma pauperis*, sued seven (7) correctional officers under 42 U.S.C. § 1983 for an October 31, 2015 use of force incident that occurred while Brown was a pretrial detainee at Bay County Jail ("BCJ") and the disciplinary report, subsequent arrest and partial prosecution of Brown that occurred subsequent to the incident.  ECF Doc. 28 (Fourth Amended Complaint).

Plaintiff's fourth amended complaint, ECF Doc. 28, contains the following five (5) counts:

Count I alleges that Defendant Mastro violated his Eighth Amendment rights and committed the Florida torts of sexual assault, assault and battery, and intentional infliction of emotional distress by sodomizing Brown by intentionally insert his finger in Brown's rectum.

Count II alleges that Mastro violated Brown's Fourteenth Amendment rights by engaging in the same conduct as alleged in Count I and that Rigsby, Lilly, Davis and Puckett violated Brown's Fourteenth Amendment rights and committed the Florida torts of sexual assault, assault and battery, and intentional infliction of

emotional distress "when they chocked, strangled, suffocated and hog-tied the Plaintiff without provocation or need" maliciously and sadistically.

Count III alleges that Davis, Puckett, and Nelson violated Brown's Fourteenth Amendment rights and committed the Florida torts of sexual assault, assault and battery, and intentional infliction of emotional distress by failing to intervene in the above excessive force.

Count IV alleges that Rigsby, Lilly and Delaney violated Brown's First Amendment rights by "retaliating against the Plaintiff when he endeavor[ed] to file a grievance and internal affair complaint concerning his legal material and the abuse he suffer on October 31, 2015."

Count V alleges that Delaney violated Brown's Fourth Amendment rights by "falsely arresting the Plaintiff without probable cause and causing his bond to be revoke[d] depriving the Plaintiff of his liberty." Brown also alleges Delaney committed the Florida torts of false arrest and malicious prosecution. ECF Doc. 28 at 13-15.

Brown seeks injunctive relief and compensatory and punitive damages in excess of $5,000,000.00, as well as such other relief as this Court deems proper.

## II. SUMMARY JUDGMENT STANDARD

To prevail on their motions for summary judgment, Defendants must show Plaintiff has no evidence to support his case or present affirmative evidence that

Plaintiff will be unable to prove his case at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986). If Defendants successfully negate an essential element of Plaintiff's case, the burden shifts to Plaintiff to come forward with evidentiary material demonstrating a genuine issue of fact for trial. *Id.* The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 248 (1986) (emphases omitted). An issue of fact is material if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case. *See id.*; *accord Tipton v. Bergrohr GMBH–Siegen,* 965 F.2d 994, 998 (11th Cir. 1992).

Additionally, the Court must view all the evidence, and all factual inferences reasonably drawn from the evidence, "in the light most favorable to the non-moving party." *Hairston v. Gainesville Sun Publ'g Co.,* 9 F.3d 913, 918 (11th Cir. 1993). "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." *Miranda v. B & B Cash Grocery Store, Inc.,* 975 F.2d 1518, 1534 (11th Cir.1992) (citing *Mercantile Bank & Trust Co. v. Fidelity and Deposit Co.,* 750 F.2d 838, 841 (11th Cir. 1985)).

The Court is not obliged, however, to deny summary judgment for the moving party when the evidence favoring the nonmoving party is "merely colorable or is not

significantly probative." *Anderson,* 477 U.S. at 249–50 (citations omitted). "A mere 'scintilla' of evidence supporting the [nonmoving] party's position will not suffice" to demonstrate a material issue of genuine fact that precludes summary judgment. *Walker v. Darby,* 911 F.2d 1573, 1577 (11th Cir.1990) (quoting *Anderson,* 477 U.S. at 242). "[C]onclusory allegations without specific supporting facts have no probative value," and are legally insufficient to defeat summary judgment. *Leigh v. Warner Bros., Inc.,* 212 F.3d 1210, 1217 (11th Cir. 2000). Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial'" and a court should grant summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, (1986) (citation omitted).

## III.    DISCUSSION

In determining whether Defendants are entitled to judgment, the undersigned considered the Defendants' declarations, Plaintiff's medical records, and video evidence of the October 31 incident, as well as Plaintiff's declaration. Additionally, the undersigned also considered the allegations in Plaintiff's fourth amended complaint. *See Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1098 (11th Cir. 2014) (court must consider "specific facts" pled in a plaintiff's sworn complaint when considering his opposition to summary judgment); *Barker v. Norman*, 651

F.2d 1107, 1115 (5th Cir. Unit A 1981) (a verified complaint serves the same purpose of an affidavit for purposes of summary judgment).

As discussed in detail below, the undersigned finds that Defendants are entitled to judgment on all counts.[2]  First, as to Plaintiff's Fourteenth Amendment claim, the video and medical evidence "blatantly contradict" Plaintiff's version of events such that no reasonable jury could find that Defendants used excessive force on Plaintiff.  Second, Plaintiff's failure to intervene claim fails because of lack of use of excessive force.  Third, Plaintiff's First Amendment retaliation claim fails because Plaintiff did not engage in protected speech and has offered no more than conclusory allegations of retaliatory motive against Defendants.  Fourth, Plaintiff's false prosecution claim against Defendant Delaney fails because probable cause existed for charging Plaintiff with making a false report about a law enforcement officer.  Finally, Plaintiff's state law claims fail for the same reasons that are fatal to his federal claims.

---

[2] Rigsby offered evidence that he was not on duty on the night of the alleged incident, October 31, 2015, ECF Doc. 79-6 at 2-8, and that he was also not the on-call supervisor who authorized the use of force against Plaintiff.  *Id.* at 4.  Plaintiff admitted at his deposition that he failed to respond to Defendant Rigsby's request for interrogatories because Brown intended to remove Rigsby from the complaint.  ECF Doc. 79-1 at 3.  Thus, in addition to the reasons set forth herein, judgment should be entered in favor of Rigsby on the additional ground that he was not present during the use of force incident.

### A.    Use of Excessive Force

As stated above, Plaintiff asserts an Eighth Amendment claim (Count I) and Fourteenth Amendment (Count II) claim against Defendant Maestro, arising out of the October 31, use of force incident.  As an initial matter, since Plaintiff was a pretrial detainee on October 31, 2015, his excessive force claims are subject to review under the Due Process Clause of the Fourteenth Amendment which prohibits the imposition of punishment on those who have not yet been convicted of a crime, rather than the Eighth Amendment's prohibition against cruel and unusual punishment which governs claims of convicted inmates.  *Bell v. Wolfish*, 441 U.S. 520 (1979); *Cottrell v. Caldwell*, 85 F.3d 1480, 1490 (11th Cir. 1996) ("Claims involving the mistreatment of arrestees or pretrial detainees in custody are governed by the Fourteenth Amendment's Due Process Clause instead of the Eighth Amendment's Cruel and Unusual Punishment Clause, which applies to such claims by convicted prisoners.").  Thus, Count I of Plaintiff's amended complaint, which is premised on an Eighth Amendment violation should be dismissed.

That said, the analysis of whether excessive force was used is the same regardless of whether the analysis is done under the contours of the Eighth Amendment or Fourteenth Amendment.  *See Tittle v. Jefferson County Commission*, 10 F.3d 1535, 1539 (11th Cir. 1994) ( "[w]hether the alleged violation is reviewed under the Eighth or Fourteenth Amendment is immaterial"); *Hamm v. DeKalb*

*County*, 774 F.2d 1567, 1574 (11th Cir. 1985), *cert. denied*, 475 U.S. 1096 (1986) (holding that for analytical purposes, there is no meaningful difference between the analysis required by the Fourteenth Amendment and that required by the Eighth Amendment.). Like the Eighth Amendment, the Fourteenth Amendment "guards against the use of excessive force against arrestees and pretrial detainees." *J W ex rel. Tammy Williams v. Birmingham Bd. of Educ.*, 904 F.3d 1248, 1259 (11th Cir. 2018).

The courts recognize that officers have "legitimate interests" in "preserv[ing] internal order and discipline" and "maintain[ing] institutional security," and officers also are frequently called upon to make "split-second judgments" in situations "that are tense, uncertain, and rapidly evolving." *Piazza*, 923 F.3d at 953 (quoting *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015)). The Eleventh Circuit has recognized that officers have a duty to act – including with appropriate force and restraints – when an inmate's misbehavior disrupts operations at a jail. *Coffman v. Battle*, 786 F. App'x 926, 930–31 (11th Cir. 2019).

"At the same time, however, the law is clear that a use of force against a pretrial detainee 'may be defensive or preventative—but never punitive—[and] the continuing use of force is impermissible when a detainee is complying, has been forced to comply, or is clearly unable to comply.'" *Id.* (quoting *Piazza v. Jefferson Cty., Ala.*, 923 F.3d 947, 953 (11th Cir. 2019). "In turn, one way of establishing that

a use of force is objectively unreasonable—and thus excessive and unconstitutional—is to show that the officer 'continue[d] to use substantial force against a prisoner who has clearly stopped resisting—whether because he has decided to become compliant, he has been subdued, or he is otherwise incapacitated.'"  *Id.* at 953.  However, "a pretrial detainee raising a Fourteenth Amendment claim needn't prove an officer's subjective intent to harm but instead need show only that 'the force purposely or knowingly used against him was objectively unreasonable."  *Piazza*, 923 F.3d at 952 (citing *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015)).

As discussed in detail below, the video and medical evidence submitted by the Defendants of the October 31 incident "blatantly contradict[s]" Plaintiff's version of events.  *See Jones v. City of Cincinnati*, 736 F.3d 688, 692 (6th Cir. 2012) (quoting *Scott v. Harris,* 550 U.S. 372, 380–82 (2007)).  Thus, the Court must "view[] the facts in the light depicted by the videotape" and cannot adopt the version of the facts offered by the Plaintiff.  *See Jones*, 736 F.3d at 692; *Scott,* 550 U.S. at 380 ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").  Viewing the facts as depicted in the videotapes leads the undersigned

to conclude that no reasonable jury could find that excessive force was used or that Maestro sexually assaulted Plaintiff by inserting his finger into Plaintiff's rectum.

### 1. Plaintiffs' Version Versus The Video Evidence

Brown arrived at the Bay County Jail in February of 2015, having just been released from the hospital after a car accident.[3]  ECF Doc. 85-1 at 23.  He alleges he "was an active voice for inmates in the unit who could not speak for themselves," and because of this, officers did not like him.  *Id.*  He further claims that Lilly and Mastro threatened him, including Lilly telling Brown a week before the October 31st incident "that [he] had a big mouth and one day [Lilly] would teach [him] to keep [his] mouth closed."  *Id.*  Brown claims he "shared the same toxic relationship" with Mastro.  *Id.*

On October 29, 2015, Brown, who was assigned to Cell 8 in Dorm C-2, received a CD containing legal materials and was allowed to listen to it.  Eventually, however, the CD was confiscated by Chief Rigsby, and Brown claims he peacefully filed grievances seeking its return over the next two days.  Brown alleges that when Lilly came on shift at 6:00 p.m. on October 31, 2015, Brown was not creating any disturbance in the unit nor was he yelling.  *Id.*

---

[3] Brown was arrested on multiple outstanding Bay County warrants.  ECF Doc. 79-2 at 6-11; ECF Doc. 70-1 at 6-7.

At 6:15, Brown asked Mastro if Mastro could have Sgt. Jackson come over and speak with Brown. Even though Brown was not creating any disturbance, Brown saw that Mastro set up the handheld camera to tape Brown's cell. Brown believed that Mastro, who knew that Brown did not get along with Lilly, was setting up a confrontation with Lilly so that a use of force would appear authorized. Brown "became upset" and began "knocking on the food flap and yelling to get the attention of Sgt. Jackson." *Id.* at 24. The first part of the video submitted by Defendants begins with Brown banging incessantly and loudly on the door of his cell for around 5 minutes. ECF Doc. 95 Exhibit K.

At several points, Nelson and another officer speak with Brown telling him that Sgt. Jackson is busy dealing with a jail emergency and asking Brown if he is "going to refrain from beating on the door" or "I'm asking you to stop beating on the door." *See, e.g., id.* at (05:48, 06:27-06:35, 06:44).[4] Brown did not respond to such questions but instead continued asking for Sgt. Jackson while declining to tell the officers why (instead, stating, "that's between me and Sgt. Jackson" (Exh. K at (05:02 to 05:06)) and accusing the officers of lying to him (*e.g., id.* at 05:59 to 06:06). He complained that it was "going on 9:30" (meaning he had been banging on the door for three hours) and immediately returned to banging the food flap

---

[4] The parentheticals note the time elapsed on the video and not the time of day of the events.

continuously.  Exh. K (at 07:21).  The banging is deafeningly loud and sufficient to create a disturbance.  Indeed, (at 17:20-25) an inmate can be heard shouting loudly, complaining about Brown's banging.  Throughout the video, the inmate to the right of Brown's cell can be seen pacing and frequently stopping to look toward Brown's cell.  Brown is seen and heard banging on the flap for the remainder of the video, frequently having to change arms when he got tired (from 07:21).  He also began wailing loudly starting (at 17:30) on the video.

The second video (Exh. L) begins with Lilly speaking to the video camera. He states that the date is "10/31" and the time is "21:39."  Exh. L (00:02 to 00:09). Brown alleges that he was "not loud, yelling, or screaming" and was "peacefully seated on my bunk trying to talk to Lt. Lilly about my constitutional right to complain" at the time that Lilly "did his lead in statement on the handheld camera." *Id.*  In the video evidence, however, Brown can be heard yelling so loudly in the background that Lilly can barely be understood.  Exh. L (00:08 to 01:33).

Lilly explains the following on camera:

Inmate Brown is in his cell . . . .  When I was approaching C-2, he was banging on the door.  He is constantly talking in a loud voice, disrupting the normal operations of this facility.  I have been given authorization by Mr. Anglin to proceed with restraints, restraining inmate Brown. We have documentation that he has been in this disruptive mode – banging and talking in a loud manner – the last two days.  At this time we are going to proceed to Mr. Brown's cell and give him verbal orders to cease from this behavior and be quiet.

Exh. L (00:25 to 01:16).  Lilly's demeanor was calm and resigned, while Brown can be heard yelling (not merely talking) and taunting Lilly from his cell.

Brown avers that when Lilly arrived outside the unit, he immediately stopped the noise because he did not want to upset Lilly and he wanted to frustrate Mastro's apparent plan to create a use of force.  He claims Lilly came into the unit "very angry and frustrated" but that Brown talked with him in a calm and nonthreatening manner.  Brown alleges that Lilly told him, "I spoke with Chief Rigsby about your evidence and he is tired of hearing your complaints and that if I continued talking about the matter that Chief Rigsby authorize him/Lt. Lilly to use force in order to shut me up."  ECF Doc. 85-1 at 24.  Brown alleges that he responded, "I would stop banging and yelling but I would not stop complaining and talking because it's my constitutional right."  *Id.*  Brown avers that Lt. Lilly then responded, "If you won't shut up then I will shut you up."  *Id.*  Brown alleges that although he observed the video camera set up and recording his cell, that portion of the video was not included with the videos supplied by defendants during discovery.  *Id.* at 25.  The exclusion of that portion of the video, however, is irrelevant to whether the use of force at issue was excessive.  Moreover, Brown's depiction is not consistent with the video evidence.

The video shows that when Lilly approaches Brown's cell, Brown states – at a quieter volume than he had been speaking -- that he is "minding his own business . . .  I'm just requesting to speak with the Sgt."  (01:20 to 01:30).  Lilly asks Brown

if he is going to be quiet, but Brown ignores him, causing Lilly to firmly order, "Inmate Brown Cease Talking." (01:31). Lilly waits a second, but Brown continues talking. Lilly orders a second time for Brown to quit talking, and Brown continues talking. (01:36). Lilly then states, "Inmate Brown, this is your third order. Cease talking." (01:39). Brown ignores him, and Lilly walks away and out of camera view. (01:43).

Brown continues talking loudly to the camera, asserting that he had merely been speaking in a calm voice, and that he had the constitutional right to do so. For some reason, Brown then tells the camera Brown just "disobey[ed] a verbal order," and that, if Lilly had a problem with it, he should institute a disciplinary proceeding against Brown. (02:02)

At (02:27), Lilly returns with restraints and states to the camera, "At this time, we are going to be entering Inmate Brown's cell." Defendant Mastro is with Lilly, and Lilly notes that he has "Corporal Davis from booking" and another officer from booking whose name cannot be clearly heard because of Brown's yelling in the background.[5] (02:35). Lilly calmly states, "They are going to assist in the application of restraints on Inmate Brown." (02:37).

---

[5] The parties appear to agree that this officer was Defendant Puckett.

Lilly then asks Brown, "You going to cuff up?" and Brown answers a loud "No." (02:40 to 02:43). As Lilly begins to open the cell door, Brown speaks to the camera that the officers have entered the cell to do harm to him and that he was not doing anything. At 03:00 Lilly opens the cell door and Mastro enters first and, before touching Brown, directs him to "turn around" so that he can be cuffed. (03:01). Brown answers "Nope" and refuses, so Mastro reaches down to attempt to turn Brown around. Brown continues to say "Nope" and continues to struggle until Brown, Mastro, Lilly, Davis and the other officer are in the cell. Brown continues to say "Nope" and continues to resist being turned over.

Eventually, as Nelson enters the cell, Brown -- again obviously speaking for the benefit the camera -- stated in a calm voice, "I have just been assaulted by these officers for no reason" and "Mastro . . . is putting his finger in my asshole right now." (03:45). The video shows the position of Mastro's head, shoulders and torso but not his hands at that particular time. A few seconds later, however, after Lilly directed Nelson to bring the hand-held camera into the cell, Mastro's head, shoulders and torso are in the same position, and we can see that he is holding Brown's wrists which he is keeping behind Brown's back. His hands are not near Brown's buttocks even though Brown is heard screaming "rape!" as if in pain. (*e.g.*, 04:13 to 04:18). Based on the depictions in the video, including the demeanor of the officers, the

undersigned finds that no reasonable jury could find that Mastro stuck his finger in Brown's rectum and removed it during the brief time his hands were not visible. *See Jacoby v. Keers,* 779 F. App'x 676, 680 (11th Cir. 2019) ("No reasonable jury could find that the defendants had time to grab Jacoby's head, rub it in mace on the floor, and then return their hands and bodies back to their original positions during the two seconds in which the footage was obstructed.").

Despite the video showing no officer sexually assaulting Brown, Brown screams, "Lt. Lilly, get your finger out my asshole" at the same instant that on the video, Lilly's hands are plainly visible nowhere near Brown's buttocks. (04:20 to 04:25). All the while, the demeanor of the officers is calm and professional, despite the physical resistance and constant yelling of Brown. At (05:05) Brown complains that he cannot breathe. Lilly responds, "If you can't breathe then you can't talk." Brown then proceeds to yell a string of obscenities at Lilly, showing that he could indeed breathe. They repeat this exchange at around (05:28 to 05:30).

In his Fourth Amended Complaint, Brown alleges that during this time, he "attempted to snatch his face from [Lilly's] grasp," which "infuriated Defendant Lilly at which point he began repeatedly punching the Plaintiff in the face with a closed fist while stating, 'you brought this on yourself and I told you shut your mouth." ECF Doc. 28 at 13. Although Lilly can be heard making those statements

on the video at (05:04), the video also shows Lilly simply holding Brown's upper half down and not, at any time, punching Brown even once, much less "repeatedly."

Lilly admits in his declaration that he does lose his temper during this incident with Brown, and when that occurs Lilly is seen pushing Brown's head down twice. An investigation into the use of force incident reached the same conclusion, and as a result, Lilly volunteered to take a demotion. ECF Doc. 79-3 at 2-3. When viewing the totality of the circumstances, however, no reasonable jury could find that Lilly's use of force was objectively unreasonable. Indeed, Brown can be seen on the video continuing to resist the officers' attempts to apply the restraints.

Moreover, for the remainder of the video, even after the restraints are placed on him, for over another twenty (20) minutes, Brown continues his disruptive behavior, yelling out of the cell, and saying that he is bleeding out of his mouth and other parts of his body, despite that not being the case. Other inmates can be heard telling him to be quiet, but he does not listen. The video evidence shows that this is simply not a case where the force used against a pretrial detainee is more severe than is necessary to subdue him or otherwise achieve a permissible governmental objective, such that it crosses the threshold of "punishment" and is therefore unconstitutional. *See Piazza*, 923 F.3d at 952.

2.    <u>The force used was not objectively unreasonable</u>

Courts gauge whether force is objectively unreasonable "from the perspective of a reasonable officer on the scene." *Kingsley*, 135 S. Ct. at 2473. The following factors guide the analysis: (1) the relationship between the need for the use of force and the amount of force used; (2) the extent of the plaintiff's injury; (3) any effort made by the officer to temper or to limit the amount of force; (4) the severity of the security problem at issue; (5) the threat reasonably perceived by the officer; and (6) whether the plaintiff was actively resisting. *Id.* (citing *Graham v. Connor*, 490 U.S. 386, 397 (1989) (stating that in an excessive force case "the question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them") (internal quotation marks omitted)). When considering these factors, the courts "give a wide range of deference to prison officials acting to preserve discipline and security, including when considering decisions made at the scene of a disturbance." *Fennell v. Gilstrap,* 559 F.3d 1212, 1217 (11th Cir. 2009) (quotation marks omitted).

a.  The need for the application of force, the severity of the security problem, the threat perceived by Defendants and Plaintiff's active resistance

A review of the video makes clear that all the factors from *Graham* used to determine if the use of force was objectively reasonable militate against Brown. The officers acted with restraint, despite recalcitrant conduct by Brown. Brown was

disruptive, resisted officers, failed to obey orders, and made up facts in his real time narration that simply did not occur.  Also, although there is no video footage of the previous two days of disturbance that Lilly spoke of, the videos show -- and Brown admits[6] -- that he was banging on his door and being disruptive for at the very least three-and-a-half hours.  Brown also was given three verbal orders by Lilly to be quiet and admitted on video that he was guilty of "disobeying a verbal order."  Brown's conduct also agitated other inmates on the cell block.

Thus, Brown's disruptive behavior was severe and there was a need for the use of force and for restraints to be placed on him.  *See Coulston v. Glunt,* 665 F. App'x 128, 132 (3d Cir. 2016) (affirming grant of judgment in favor of defendant on excessive force claim where "despite [plaintiff]'s assertions to the contrary, the video showed that [defendant] acted in an effort to maintain discipline"); *see Burke v. Brown,* 653 F. App'x 683, 696 (11th Cir. 2016) (affirming judgment for defendant and finding there was no question officers "had a significant need to bring Plaintiff under control," where evidence showed "Plaintiff was aware that a use-of-force team had been assembled and was warned that pepper spray would be used if he did not comply with officers' orders.  In response, Plaintiff shouted expletives at the officers

---

[6] *See, e.g.*, ECF Doc. 85-1 at ¶¶ 34-37, where Brown admits that at 6:15 p.m. he asked for Sgt. Jackson, noticed that Mastro was setting up the video camera, became upset, and "began knocking on the food flap and yelling to get the attention of Sgt. Jackson."  Lt. Lilly stated on video that the time was "21:39," which is 9:39 p.m.  Brown had been banging and yelling for more than three hours.

and was otherwise hostile."), citing *Bennett v. Parker*, 898 F.2d 1530, 1533 (11th Cir. 1990) ("Prison guards may use force when necessary to restore order and need not wait until disturbances reach dangerous proportions before responding."). Moreover, Plaintiff can be seen in the video resisting Defendants' attempt to restrain him, telling officers "Nope," repeatedly and refusing to turn around or turn over.

> b. Plaintiff did not suffer a more than *de minimis* injury

Plaintiff alleges in his fourth amended complaint that he had pain while defecating and blood in his stool the next day; that Lilly's "particular use of force" caused muscle spasm in his neck, a debilitating neck injury and permanent scars on his neck; and that he had bruises which were documented by a nurse at the jail. ECF Doc. 28 at 27. The record, again, blatantly contradicts these claims.

After Plaintiff was restrained, BCJ medical staff examined Plaintiff and checked his vitals. ECF Docs. 79-9 at 7-23; 79-2 at 94, Exh. L at (09:00). Plaintiff's oxygen was 100%. An abrasion was noted on his left middle knuckle and on his right wrist. Medical staff noted that inside Plaintiff's mouth he had what appeared to be a bite on his cheek, as well as on his upper lip. ECF Doc. 79-9 at 19. A nurse checked on Plaintiff on two separate occasions after the use of force incident. ECF Doc. 79-2 at 46. BCJ medical staff also checked Plaintiff's anus area, and no evidence of penetration or bleeding existed. ECF Doc. 79-2 at 144-47. Also, since Plaintiff alleged Mastro inserted his finger into Plaintiff's anus during the restraint

attempt,[7] Plaintiff was transported to Bay Medical Center, where a sexual examination was completed by Dr. McAllister.   ECF Doc. 79-9 at 67-79.   Dr. McAllister documented "no peri-rectal injuries noted. No evidence of any active bleeding." *Id.*  There was no bleeding noted from Plaintiff's rectum area or his face. *Id.*

The abrasion on his left knuckle and right wrist and bites on his lip and inside of his cheek are, at best, *de minimis* injuries.  *See e.g., Nolin v. Isbell,* 207 F.3d 1253, 1258 n. 4 (11th Cir. 2000) (bruises received during an arrest were a *de minimis* injury); *Siglar v. Hightower,* 112 F.3d 191, 193 (5th Cir. 1997) (finding that a bruised ear which lasted for three days was a *de minimis* injury); *McDonald v. Neal,* 2013 WL 6410402 (S.D. Ala. Dec. 9, 2013) (finding the allegations of an officer poking the plaintiff with a nightstick, slapping him two to three times across the face, and shoving him into the wall did not present a physical injury); *Mobley v. Grasco,* 2011 U.S. Dist. LEXIS 81136, *6–8, 2011 WL 3163159 (N.D. Fla. July 1, 2011) (finding the claim of "pain and suffering" did not allege an injury); *In re Bayside Prison Litigation,* 2010 WL 4916716 (D. N.J. November 18, 2010) (finding that the inmate's pain and swelling of the pinky finger for two days after the officer hit his left hand with a stick was a *de minimis* injury inasmuch as the swelling was only for

---

[7] A sexual assault examination was required pursuant to Bay County Jail policy, ECF Doc. 79-2 at 62-63.

Case No. 3:17-cv-691-TKW-HTC

a couple of days, and there was no lasting pain or physical distress or restriction even though the pinky finger was slightly deformed).

The fact that Brown did not suffer a more than *de minimis* injury also militates against a finding of excessive force.[8]  *See Smith*, 524 F. App'x at 513-14 (affirming summary judgment in favor of defendant on finding of lack of a *de minimis* use of force where "record supports the finding that [plaintiff] suffered only the minor injury of facial swelling as a result of the incident"); *Vicks v. Knight*, 380 F. App'x 847, 852 (11th Cir. 2010) (affirming judgment on excessive force claim because based on the evidence presented, "a reasonable factfinder could not believe that [plaintiff] suffered any injury, and thus could not reasonably infer that [defendant] used anything more than a *de minimis* amount of force").

>    c. Defendants made several efforts to temper or limit the amount of force used

Also, the videos show that the officers offered Brown the chance to be quiet, asked him to be patient, offered him the chance to simply "cuff up," and then directed him to turn around to be cuffed before using any force.  *See Burke,* 653 F. App'x at 696 (finding defendants "went to great lengths to temper the severity of the force used, and indeed sought to avoid the use of force altogether.  Accordingly, no

---

[8] Additionally, even if Plaintiff were able to establish a constitutional violation by Defendants, he would be entitled to only nominal damages of $1.00.  *See Brooks v. Warden*, 800 F.3d 1295, 1307 (11th Cir. 2015); *see also*, Fourth Amended Complaint, seeking "such other relief" as this Court deems appropriate.

reasonable jury could find that [defendants] ordered the use of pepper spray 'maliciously and sadistically to cause harm' to Plaintiff rather than to restore discipline.").  Brown, however, declined all opportunities to be cooperative.

Similarly, Defendants also acted to temper the restraints placed on Plaintiff by having medical personnel check on Plaintiff while he was in restrains and immediately after the restraints were placed on him.

### 3. Qualified Immunity

Defendants also move for judgment based on qualified immunity.  "Qualified immunity protects government officials performing discretionary functions from suits in their individual capacities unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Dalrymple v. Reno*, 334 F.3d 991, 994 (11th Cir. 2003) (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)).  "'To receive qualified immunity, the government official must first prove that he was acting within his discretionary authority.'"  *Caldwell*, 748 F.3d at 1098 (quoting *Gonzalez v. Reno*, 325 F.3d 1228, 1233–34 (11th Cir. 2003)).

Where there is no dispute that a defendant was exercising a discretionary function, the plaintiff bears the burden of showing that Defendants are not entitled to qualified immunity.  *Brooks*, 800 F.3d at 1306; *McClish v. Nugent*, 483 F.3d 1231, 1237 (11th Cir. 2007).  To meet this burden, plaintiff must prove that (1) Defendants

violated a constitutional right and (2) this right was clearly established at the time of the alleged violation.  *Caldwell*, 748 F.3d at 1099.

Because the undersigned finds that Defendants did not violate any of Plaintiff's constitutional rights, the undersigned finds it unnecessary to proceed to the "clearly established" prong on any of Plaintiff's claims.  *See Dalrymple*, 334 F.3d at 997 ("Because we find no constitutional violation . . . we need not address whether the constitutional rights at issue were clearly established.").

### B.    Failure To Intervene

"[A]n officer can be liable for failing to intervene when another officer uses excessive force."  *Priester v. City of Riviera Beach*, 208 F.3d 919, 924 (11th Cir. 2000); *see Dukes v. Miami–Dade Cty.*, 232 F. App'x. 907, 913 (11th Cir. 2007) ("[I]f a police officer, whether supervisory or not, fails or refuses to intervene when a constitutional violation such as an unprovoked beating takes place in his presence, the officer is directly liable under Section 1983.") (*citing Ensley v. Soper*, 142 F.3d 1402, 1407 (11th Cir. 1998)).  The officer is only liable if the officer "was in a position to intervene."  *Williams v. Scott*, 433 F. App'x 801, 805 (11th Cir. 2011) ("Prison correctional officers may be held directly liable under § 1983 if they fail or refuse to intervene when a constitutional violation occurs in their presence.") (*citing Ensley*, 142 F.3d at 1407).

Defendants are entitled to judgment on this claim for three (3) reasons.  First, except for Defendant Nelson, Plaintiff alleges that the same Defendants who used excessive force against him also failed to protect him.  However, Defendants cannot be liable for both using excessive force and failing to protect.  *See Johnson v. Dixon*, 2015 WL 12851563, at *9, n. 18 (M.D. Fla. Nov. 20, 2015), *aff'd,* 666 F. App'x 828 (11th Cir. 2016) (rejecting plaintiff's argument that "officers can be found to have both beaten the plaintiff and failed to intervene").

Second, because the undersigned finds that no excessive force was used, Defendants had no constitutional obligation to intervene.  *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (plaintiff must demonstrate that he was under a substantial risk of serious harm, that the defendants were aware of facts from which they could draw that inference, and that the defendants did draw that inference); *Bash v. Patrick*, 608 F.Supp. 2d 1285, 1297, n. 7 (M.D. Ala. 2009) (derivative theory of failure to protect "cannot support liability when there was no underlying use of excessive force"), citing *Fundiller v. City of Cooper City*, 777 F.2d 1436, 1441-42 (11th Cir. 1985).

Third, even if Defendants could be liable for both putting restraints on Plaintiff and failing to take the restraints off of Plaintiff,[9] for what Plaintiff alleges

---

[9] Plaintiff describes the restraints as being "hog tied."  The video shows that the restraints included handcuffs, connected by a waist belt and feet shackles.  The restraints kept Plaintiff from standing up or straightening his legs.

was "nine hours," Defendants have presented undisputed evidence, namely the BCJ duty roster, showing that none of the Defendants were assigned to Plaintiff's dorm area or were on shift that night after the initial use of force incident occurred. Notably, Plaintiff has presented no evidence to the contrary.

### C.    First Amendment Retaliation Against Rigsby, Lilly and Delaney

Brown's retaliation claim in Count IV is directed against Rigsby (who has been dropped from the suit), Lilly and Delaney and involves a charge filed against Brown for filing a false claim against an officer arising out of the October 31 incident.  He claims that the charge "was done to discourage other inmates from coming forward and also retaliation for my complaint."  ECF Doc. 28 at 22.

To prevail on a retaliation claim, Plaintiff must establish that: (1) his speech was constitutionally protected; (2) [he] suffered adverse action such that the [official's] allegedly retaliatory conduct would likely deter a person of ordinary firmness from engaging in such speech; and (3) there is a causal relationship between the retaliatory action [the bringing of charges against Brown] and the protected speech [the grievance].  *O'Bryant v. Finch*, 637 F.3d 1207, 1212 (11th Cir. 2011) (citation and quotation marks omitted).   "It is an established principle of constitutional law that an inmate is considered to be exercising his First Amendment right of freedom of speech when he complains to the prison's administrators about

the conditions of his confinement." *Smith v. Mosley*, 532 F.3d 1270, 1276 (11th Cir. 2008).

However, "[t]o establish a retaliation claim under the First Amendment, a prisoner must show a causal connection between his protected speech and the harm of which he complains." *Smith v. Villapando*, 286 F. App'x 682, 685 (11th Cir. 2008). That is, a prisoner must allege facts showing that the alleged retaliatory conduct would not have occurred but for the retaliatory motive. Plaintiff, however, has asserted no such facts.

Plaintiff alleges no facts, for example, showing how Lilly was involved in the investigation, charging or prosecution of Brown. *See Woodard v. Town of Oakman*, 885 F. Supp. 2d 1216, 1230 (N.D. Ala. 2012) (finding that the plaintiffs' conclusory allegations are insufficient to support a First Amendment claim where plaintiffs allege no "facts showing that [defendant] had any involvement in the issuance of the warrant for, or arrest of [plaintiff]"). Although Plaintiff alleges, for the first time in his response, that Lilly's act of restraining Plaintiff was in retaliation for Brown's complaints about not being able to see Sgt. Jackson, such allegation fails for several reasons. First, "[a] plaintiff may not amend [his] complaint through argument in a brief opposing summary judgment." *See Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) (citation omitted).

Second, Brown's complaints about wanting to see Sgt. Jackson do not qualify as protected speech because it was not a complaint or grievance concerning the conditions of his imprisonment. *See Moulds v. Bullard*, 345 F. App'x 387, 393 (11th Cir. 2009). Instead, as Brown told the officers, the reason he wanted to see Sgt. Jackson was between him and the sergeant. Third, even if it were protected speech, the undersigned has already determined that based on the video evidence, the use of force (including the restraints) was necessary because of Brown's behavior unrelated to the content of his speech.

Similarly, Brown offers no evidence that Delaney began the investigation or decided to pursue charges based on a retaliatory motive. To the contrary, Defendants presented evidence that, in response to Plaintiff's accusation of "rape" or "sodomy" against Mastro, Warden Anglin asked the internal affairs investigator for the jail to investigate Plaintiff's allegations. Furthermore, Delaney avers in his affidavit that he had no knowledge of any complaints made by Brown prior to beginning his investigation. ECF Doc. 79-7 at 2-3.

Plaintiff has provided no evidence to the contrary. Plaintiff's conclusory allegation, alone, that Delaney's investigation was prompted by a retaliatory motivation is simply not sufficient to defeat summary judgment. *See Woodard*, 885 F. Supp. 2d at 1230-31 (holding that plaintiff's legal conclusion that defendant

retaliated against plaintiff for his speech is insufficient to support casual connection element of § 1983 First Amendment retaliation claim at summary judgment).

### D. Fourth Amendment False Arrest Claim

Plaintiff alleges his Fourth Amendment rights were violated when Delaney arrested him without probable cause, which caused his bond to be revoked, thus depriving him of his liberty. The Fourth Amendment prohibits government officials from detaining a person in the absence of probable cause. An arrest does not violate the Fourth Amendment if a police officer has probable cause for the arrest. *Wood v. Kesler*, 326 F.3d 872, 878 (2003). "For probable cause to exist…an arrest must be objectively reasonable based on the totality of the circumstances." *Lee v. Ferraro*, 284 F.3d 1188, 1195 (11th Cir.2002). "Although probable cause requires more than suspicion, it does not require convincing proof, and need not reach the [same] standard of conclusiveness and probability as the facts necessary to support a conviction." *Id*. at 1195 (internal quotation marks and citations omitted) (alteration in original).

The Defendants have presented unrefuted evidence that during the course of investigating Plaintiff's claim that he had been "raped" or "sodomized" by Mastro, Delaney received information that led him to believe there was a violation of Florida Statute § 794.011(10), which makes it a third degree felony for anyone to falsely

accuse a government employee or agent of sexual battery.[10]  The essential elements of that claim are the following: the suspect willfully gave or provided false information or a report about the alleged commission of a crime under Florida law to a law enforcement officer, knowing that the information was false because he knew no such crime had actually been committed.

Delaney took a sworn statement from Plaintiff.  He also interviewed Mastro, Nelson, Nurse Ziegler, Puckett, Davis and Lilly.  Dr. McAllister conducted a sexual assault examination of Plaintiff at Bay Medical Center, and Delaney spoke with Dr. McAllister regarding the results of that examination.  Dr. McAllister reported she completed a rectal swab, and her rectal examination revealed no injury or trauma to Plaintiff.  Additionally, Delaney spoke with Nurse Fromm, who examined Plaintiff immediately after he was restrained and claimed to have been sexually battered by Mastro.  Nurse Fromm also stated that she did not observe any trauma or damage to Plaintiff's rectum.

Delaney also viewed the video footage of the use of force, during which Plaintiff claimed to have been sodomized by Mastro.  Like the undersigned, Delaney determined that the video footage contradicted Plaintiff's allegations.  Thus, upon

---

[10] The Investigative Report is found at ECF Doc. 79-2, beginning at page 97.

completion of his investigation, Delaney prepared a complaint affidavit and submitted it to the state court. ECF Doc. 79-8 (affidavit of state attorney).

The evidence produced by Defendant established probable cause to believe that Brown violated Fla. Stat. § 794.011(10) by willfully giving or providing "false information or a report about the alleged commission of a crime under Florida law to a law enforcement officer, knowing that the information was false because he knew no such crime had actually been committed." Indeed, the State Attorney also found probable cause, after reviewing Delaney's complaint, when he independently decided to prosecute Brown. ECF Doc. 79-8.

### E.    Deliberate Indifference Claims

In Counts II and III of Plaintiff's Fourth Amended Complaint, Plaintiff alleges Defendants were deliberately indifferent under the Fourteenth Amendment for the same conduct that occurred during the October 31 incident. As Defendants point out, this claim is the same as Plaintiff's failure to intervene claim. *See Johnson*, 2015 WL 12851563 at *11 (granting summary judgment on deliberate indifference claim because "the nonfeasance standard applied to failure to intervene to prevent unconstitutional excessive force by a corrections officer is no more onerous than deliberate indifference"). Thus, for the same reasons that Plaintiff's failure to intervene claim fails, Plaintiff's deliberate indifference claim also fails.

To the extent Plaintiff is trying to state a claim for deliberate indifference to a medical need, he has provided no facts or evidence to support such a claim. "To show that a prison official acted with deliberate indifference to serious medical needs, a plaintiff must satisfy both an objective and a subjective inquiry." *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003). A plaintiff must show that he had an objectively serious medical need, that the defendants were deliberately indifferent to that need; and that there was a causal link between that indifference and the plaintiff's injury. *Mann v. Taser Intl. Inc.*, 588 F.3d 1291, 1306–07 (11th Cir. 2009). A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Farrow*, 320 F.3d at 1245 (quotation and citations omitted). In either situation, the need must be "one that, if left unattended, poses a substantial risk of serious harm." *Id.* (quotations, citations, and alteration omitted).

In this case, however, and as discussed above, the medical records show that Plaintiff did not have a more than *de minimis* injury from the use of force incident. Thus, he could not have had a serious medical need.

## F.    State-law Claims

As stated above, Plaintiff also seeks recovery against Defendants under Florida state law for sexual assault, assault and battery, malicious prosecution, and intentional infliction of emotional distress assault and battery. For the same reasons

that Plaintiff's constitutional claims fail, these state law claims also fail.  As to the sexual assault and assault and battery claim, the video and medical evidence blatantly contradict that Plaintiff was either sexually assaulted or that the force used was excessive.  *Davis v. Williams*, 451 F.3d 759, 768 (11th Cir. 2006) (under Florida Law "officers are only liable for damage where the force used is 'clearly excessive'").

Similarly, the state law malicious prosecution claim fails because Delaney had probable cause to file a complaint charging Plaintiff with making a false claim against Maestro.  *See Fee, Parker, & Lloyd, P.A.,* 379 So. 2d 412 (Fla. 4th DCA 1980) (one of the elements of a malicious prosecution claim under Florida law is the absence of probable cause).  Finally, Plaintiff's state law intentional infliction of emotional distress claim fails because Brown has shown no "extreme abuse" by Defendants of their positions or conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  *Metro. Life Ins. Co. v. McCarson*, 47 So. 2d 277, 278 (Fla. 1985).

## IV.   CONCLUSION

Accordingly, it is respectfully RECOMMENDED that,

1.    Defendants' Motions for Summary Judgment be GRANTED on all claims.

2.      The clerk be directed to close this file.

At Pensacola, Florida, this 27th day of March, 2020.

*/s/ Hope Thai Cannon*

**HOPE THAI CANNON**
**UNITED STATES MAGISTRATE JUDGE**

<u>NOTICE TO THE PARTIES</u>

Objections to these proposed findings and recommendations may be filed within fourteen (14) days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of objections shall be served upon the magistrate judge and all other parties.  A party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions.  *See* U.S. Ct. of App. 11th Cir. Rule 3-1; 28 U.S.C. § 636.